UNITED STATES of America ex rel.
SHAKOPEE MDEWAKANTON
SIOUX COMMUNITY, Plaintiff,

v.

PAN AMERICAN MANAGEMENT COMPANY; New England Entertainment Company: Dennis Courtney d/b/a New England Entertainment Company; Alan Arbogast d/b/a New England Entertainment; John Panetta d/b/a New England Entertainment Company; Michael Forschette d/b/a New England Entertainment Company; Little Enterprise; Alfred Estrada, Defendants.

LITTLE SIX ENTERPRISES, Plaintiff,

v.

Donald P. HODEL, Secretary United States Department of Interior, and John W. Fritz, Deputy Assistant Secretary of Indian Affairs, Defendants,

and

Shakopee Mdewakanton Sioux Community, Intervenor.

Civ. Nos. 4-85-231, 4-85-880.

United States District Court,
D. Minnesota,
Fourth Division.

Aug. 9, 1985.

Reid Peyton Chambers, Sonosky, Chambers & Sachse, Washington, D.C., and Larry B. Leventhal and James Townsend, Minneapolis, Minn., for Shakopee Mdewakanton Sioux Community.

George F. McGunnigle, Leonard, Street & Deinard, Minneapolis, Minn., and Aidan D. Jones, Finley, Kumble, Wagner, Heine, Underberg, Manley & Casey, Washington, D.C., for Pan American Intern. Management Co., New England Entertainment Co., John Panetta, Little Six Enterprises, Alfred Estrada.

Peter C. Monson, Dept. of Justice, Washington, D.C., and Mary Carlson, Asst. U.S. Atty., Minneapolis, Minn., for Secretary of Interior.

## MEMORANDUM OPINION AND ORDER

DIANA E. MURPHY, District Judge.

These related cases arise out of a dispute over the management agreements for bingo facilities operating on tribal trust lands of the Shakopee Mdewakanton Sioux Community (Community) near Prior Lake, Minnesota.

In the first filed action, Civ. No. 4–85–231, the Community seeks injunctive relief, declaratory judgment, damages, and an accounting, against defendants, several companies that have entered into or been assigned rights in agreements to manage the plaintiffs' two bingo operations and individuals employed by those companies, alleging that the management agreements have not been approved by the Secretary of Interior as required by 25 U.S.C. §§ 81 and 415, and breach of contract. Jurisdiction is alleged under 28 U.S.C. §§ 1331 and 1362. Defendants Pan American Management Co., Inc.,[1] New England Entertainment Company, John Panetta, Little Six Enterprises (Little Six), Alfred Estrada, and Robert Page have filed an amended answer and counterclaim.[2] The counterclaim seeks damages and declaratory and injunctive relief alleging breach of contract, unjust enrichment, detrimental reliance, tortious interference with business relationships, and tortious breach of contract. Presently before the court are the parties' cross-motions for partial summary judgment and the defendants' motion for a stay. The Community seeks summary judgment on the issue of whether the management contracts are null and void under 25 U.S.C. § 81 because they have not been approved by the Secretary of Interior. The defendants, with the exception of Little Six, seek summary judgment on the complaint based on lack of subject matter and personal jurisdiction. The defendants also seek a stay of the proceedings pending disposition of the related case before the court, *Little Six Enterprises v. Hodel*, Civ. No. 4–85–880.

The court has also consolidated before it Civ. No. 4–85–399, an action brought by Little Six Enterprises in state court and removed to federal court by the Community and the individual defendants who are members of the Community. Little Six Enterprises seeks relief similar to that prayed for in the defendants' counterclaim in this action, but in addition asserts that the members of the Community have made

---

1. The answer states that the correct corporate name is Pan American International Management Co., Inc.

2. The parties have by stipulation and order of the court dated May 13, 1985 dismissed Robert Page as a defendant without prejudice.

false and malicious statements. It also seeks punitive damages.

In the third related action, Civ. 4–85–880, Little Six seeks mandamus and declaratory and injunctive relief against defendants, Secretary of the Interior Donald P. Hodel, and Deputy Assistant Secretary-Indian Affairs John W. Fritz, (the government), alleging that the June 17, 1985 decision of Fritz disapproving the bingo management contracts was arbitrary and capricious and that the defendants have a ministerial duty to approve the 1983 management agreement. Jurisdiction is alleged under 28 U.S.C. § 1331. The action was filed June 25, 1985 in the district of the District of Columbia and subsequently transferred to this court. The Community sought and was granted leave to intervene as a party-defendant. Presently before the court is the motion of Little Six for preliminary injunctive relief, which has been consolidated with a hearing on the merits under Fed.R.Civ.P. 65(a)(2), and cross-motions by the government and Little Six for summary judgment.

## Background

The Community is a federally recognized Indian tribe which has adopted and operates under a Constitution approved by the Secretary of the Interior pursuant to the provisions of the Indian Reorganization Act of 1934, 25 U.S.C. § 476. It is a small Indian community occupying less than 300 acres of tribal land.

On April 10, 1982, defendant New England Entertainment Co. (New England) signed a management agreement with the Community to develop and run a bingo operation on tribal lands.[3] The agreement was negotiated over a three day period. Although Department of the Interior and Bureau of Indian Affairs (BIA) officials were consulted about the agreement, they did not formally approve or reject it at that time.

Counsel for New England who negotiated the contract states that the BIA officials present at the negotiating session represented that the agreement did not require BIA approval and that it was the government's position that 25 U.S.C. § 81 did not apply to contracts of this type.[4] Mariana Shulstad participated in the negotiations in her role as First Assistant Field Solicitor for the United States Department of the Interior. She states that it was her opinion at the time that, under applicable law, neither she nor the representatives of the BIA had any authority to approve or disapprove the contract. Norman Crooks who signed the agreement as chairman of the community states that he also believed at the time, based on the representations of the government officials, that no approval of the contract was necessary. The agreement specifically notes at the outset that the Community is an organized and federally recognized Indian community. The agreement contains a legal description of the property located on tribal trust land and allows the management company to record the agreement "in any Public Records". The opening section of the agreement states that the Community is the owner of the described property which it seeks to develop to enhance its economic self-sufficiency and self-government. The Community is also said to be "desirous of vesting in [the management company] the exclusive right and obligation to finance, construct, improve, develop, manage, operate, and maintain the property in conformance with the terms and conditions of this Management Agreement."

Under the terms of the agreement, the management company was engaged for a term of 15 years "to finance and/or assist the Community in obtaining financing, to

---

3. In 1980, the Community had adopted a resolution authorizing the Community Chairman, Norman Crooks, to take all steps necessary to bring a bingo operation to the reservation.

4. Apparently, counsel for New England was previously aware that the BIA did not approve management agreements for bingo halls, but "it was his practice to meet with the [BIA] to get its tacit approval of any management agreement, although there was no necessity for it." Affidavit of Barry E. Rosenthal ¶ 4.

construct, improve, develop, manage, operate and maintain the property as a facility for the conduct of bingo games and to create other revenue producing activities upon said property as mutually agreed upon." Furthermore, the Community:

specifically warrants and represents to [the management company] that Community shall not act in any way whatsoever, either directly or indirectly, to cause this Management Agreement to be altered, amended, modified, cancelled, terminated and/or attempt to assign or transfer this Management Agreement or any right to or interest in said Agreement, without consent of the [management company]. Further, Community warrants and represents it shall take all actions necessary to insure that the Management Agreement shall remain in good standing at all times.

Two provisions specifically limit liens or encumbrances on the property. In the section where the management company is given responsibility to supervise the completion of all the construction and development, the agreement provides that "[i]n no case shall liens or encumbrances attach to the land or structures thereon, which shall at all times remain the property of the Community." Later in the agreement a provision specifically binding the Community states that the:

Community hereby specifically warrants and represents to [the management company] that Community shall not act in any way whatsoever, either directly or indirectly to cause any party to become an encumbrancer of the property subject to this Agreement without the prior written consent of [the management company] except as provided in this Agreement.

In return for providing the duties contained in the management agreement, New England was to receive "forty-five percent (45%) of the net operating profits for each fiscal year resulting from and in connection with any business activities upon the property." Initially, however, 100% of the net operating profits was to be applied to retire the debt incurred in constructing and developing the facilities. The management company also has the right to compel the Community to enter into a new management agreement under the same terms and conditions if the Community elects to establish any other bingo activities on other property on its Reservation during the 15 year period of the current agreement.

The bingo operation has operated at a large profit since commencing business and is the major source of revenue and jobs to the Community. The initial debt was repaid within the first year of operation. To date the Community has received approximately $3,321,000 in profit distributions. The parties managing the operations have received approximately $2,685,000 in management fees.

In 1982 New England assigned its interests in the agreement to New England/Pan American Entertainment Company. In 1983 New England/Pan American Entertainment Company assigned its interests to Little Six. Norman Crooks, then chairman of the Community, signed a consent to each of these assignments on behalf of the Community. On July 8, 1983 Little Six executed a new management agreement for the bingo operation. That agreement was also signed by Norman Crooks in his capacity as chairman of the Community. The terms of this agreement are essentially identical to the earlier contract with the addition of a provision for arbitration. The assignments and the new agreement were not submitted to the BIA for approval.

In July 20, 1984 defendant Fritz, Deputy Assistant Secretary-Indian Affairs, issued a memorandum to all BIA area directors indicating that where tribes requested approval of their management contracts, the department should undertake to review them. The memorandum included instructions to be observed in reviewing tribal bingo management contracts. The memorandum noted that given the department's uncertain authority to promulgate regulations of this nature, and the time it would take to do so, there was no intention to issue regulations at that time. The memorandum states that the instructions were being issued because of the recent deci-

sions of two federal courts holding that 25 U.S.C. § 81 renders tribal bingo management contracts invalid unless they are approved pursuant to that section. The memorandum also noted that it was Fritz's view and that of the Solicitor's Office that these decisions were erroneous.

On October 9, 1984, Little Six executed a separate management agreement to develop and manage a new bingo lounge in the Community Cultural Center. As with the other agreements, Norman Crooks signed the agreement in his capacity as chairman of the Community. The terms of the agreement are essentially identical to those in the earlier agreements.

Following the issuance of the July 20, 1984 memorandum by Fritz, Mariana Shulstad recommended to Norman Crooks, as chairman of the Community, that the Community request BIA approval of the bingo management agreements for the bingo lounge and the bingo hall or palace. On October 19, 1984, Crooks wrote the BIA and requested official approval of the bingo lounge agreement and of the 1983 management agreement for the bingo hall.

On December 22, 1984 Crooks was removed as chairman of the Community. Shortly thereafter an investigation into the bingo operations was authorized by the Community which ultimately led to its filing a complaint on February 8, 1985. Little Six in turn filed an action in state court which was then removed to federal court and consolidated with the prior pending action.[5]

On March 5, 1985 the Community filed a motion for summary judgment seeking to have the bingo management agreements held null and void pursuant to 25 U.S.C. § 81 and 415. The motion was withdrawn, however, after the BIA area director issued an opinion on March 8, 1985 approving the 1983 bingo management agreement and disapproving the 1984 bingo lounge management agreement. Both the Community and Little Six appealed the decision within the Department of the Interior: the Community appealing the approval of the 1983 management agreement and Little Six appealing the disapproval of the 1984 bingo lounge management agreement. The Community noted that it would be premature for the court to rule on the validity of the contracts under 25 U.S.C. § 81 until the administrative appeals were decided and the Department of the Interior had made a final administrative determination.

On June 17, 1985 Fritz issued his decision on the cross-appeals. The area director's disapproval of the bingo lounge contract was affirmed, while the approval of the bingo hall contract was reversed. Both contracts were thus disapproved. By letter dated June 20, 1985 the Community renewed its motion for summary judgment, stating that since final administrative action had been taken, the motion was ripe for determination. A hearing on the motion was set for July 17, 1985. On July 3 the defendants filed a cross-motion for partial summary judgment seeking dismissal of all named defendants with the exception of Little Six. This motion was also set for hearing on July 17. Then, on July 15, 1985, Little Six filed a motion for a stay of all proceedings in the action brought by the Community pending final disposition of Little Six's challenge to the Secretary's decision. These matters were all fully briefed by the parties and heard by the court on July 17, 1985, at which time they were taken under advisement.

On July 2, 1985 the court, after hearing the arguments of the parties, established a briefing schedule in *Little Six Enterprises v. Hodel*, for the July 17 hearing on Little Six's motion for a preliminary injunction and on the final merits of the action. Little Six subsequently filed a motion to postpone

5. The court has issued several orders relating to the Community's initial motion for a preliminary injunction and actions taken by Little Six and the Community in response to the BIA Area Director's disapproval of the bingo lounge agreement and approval of the 1983 bingo hall agreement. For purposes of these motions, that background and the court's previous memoranda opinions need not be detailed again. On April 17, 1985 the court ordered Little Six to provide the Community with its share of the March net operating profits for the bingo hall. On that same date the court also appointed Thomas A. Keller, III, Esq. as special master.

the "on the merits" briefing and hearing. On July 11, 1985 the court denied the motion, setting forth its reasons in writing and reminding the parties that additional briefing might be allowed after the hearing. Subsequently, the government filed a motion for judgment on the pleadings or in the alternative for summary judgment.

On July 17, a full hearing was had on all issues raised in *Hodel* by the complaint and the motions before the court. In response to specific inquiry by the court, the parties stated that there are no genuine issues of material fact that would prevent a decision on the merits. Little Six and the government requested and received permission to submit additional briefings on certain issues; those submissions were received by the court on July 22, at which time the matters were taken under advisement.

*Discussion*

*A. Little Six v. Hodel*

■ There is a threshold issue of choice of law. This action, originally filed in the District of Columbia, was transferred to this court pursuant to 28 U.S.C.A. 1404(a). The case was transferred by the transferor court, after a conference with counsel for all parties. The parties have spent little effort discussing and briefing what is in effect a non-issue. Ultimately all of the issues raised are governed by the holdings of the Supreme Court, and the court has discerned little or no difference in the controlling precepts of law as enunciated by the respective circuits. The court finds that since the plaintiff may have opposed the motion to transfer,[6] it is proper to apply the law that would have been applied in the transferor court, that being the District of Columbia. *See C. Wright, Handbook of the Law of Federal Courts* § 44 at 166 (2d ed. 1970).

*Standing*

■ Determining whether a party has standing is a "threshold question in every federal case [that] determin[es] the power

of the court to entertain the suit." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). Whether a party has standing to obtain review of agency action turns on three factors:

(1) the complainant must allege injury in fact; (2) the complainant must assert that arbitrary or capricious agency action injured an interest arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question; and (3) there must be no "clear and convincing" indication of a legislative intent to withhold judicial review.

*National Treasury Employees Union v. United States Merit Systems Protection Bd.,* 743 F.2d 895, 910 (D.C.Cir.1984); *Control Data Corp. v. Baldrige,* 655 F.2d 283, 288–89 (D.C.Cir.), *cert. denied,* 454 U.S. 881, 102 S.Ct. 363, 70 L.Ed.2d 190 (1981); *see also Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976); *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

■ A plaintiff must meet the element of an injury in fact before he is entitled to obtain relief in federal courts. He must demonstrate an actual or threatened injury caused by the alleged illegal conduct of the defendant which is likely to be redressed by a favorable decision. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). The injury alleged by Little Six is the risk that the management agreements will be found void under 25 U.S.C. § 81 and that it will lose its contractual rights. Little Six asserts that approval by the Deputy Assistant Secretary would insulate it from liability under § 81. This is a threatened injury which can fairly be traced to the challenged conduct of Deputy Assistant Secretary Fritz. If Little Six's prayer for

6. This court had been informed in a telephone call from the transferor court prior to transfer that no party opposed transfer. The court began the July 2, 1985 telephone conference with counsel for all parties by stating this factual predicate to its understanding of the case, and no party took issue with this characterization of the transfer.

relief were granted, it would likely redress such injury.

■ A plaintiff must also be "arguably within the zone of interest to be protected or regulated by the statute ... in question." *Valley Forge*, 454 U.S. at 475, 102 S.Ct. at 760 (quoting *Data Processing Serv.*, 397 U.S. at 153, 90 S.Ct. at 830.) The zone of interest test "requires some indicia—however slight—that the litigant before the court was intended to be protected, benefited or regulated by the statute under which suit is brought." *Autolog Corp. v. Regan*, 731 F.2d 25, 29 (D.C.Cir. 1984).

It is uncontroverted that the statute, 25 U.S.C. § 81, was enacted solely for the protection and benefit of Indians. Little Six asserts that it satisfies the zone test because the government is attempting under § 81 to regulate its ability to contract with an Indian tribe. Because § 81 requires the Secretary to review contracts within the statutory terms, it argues that it is regulated and that the zone of interest standard has been met. It appears to the court that the statute is concerned with the Indian tribes and their ability to contract, however. The potential economic interest of nonIndians in a contractual relationship with a tribe is not within the intended purview of the statute. *See Leaf Tobacco Exporters Ass'n, Inc. v. Block*, 749 F.2d 1106 (4th Cir.1984); *Granville House, Inc. v. Department of Health and Human Services*, 715 F.2d 1292 (8th Cir.1983); *Dialysis Centers, Ltd.*, 657 F.2d 135 (7th Cir. 1981); *cf. Bryan v. Itasca County*, 426 U.S. 373, 392, 96 S.Ct. 2102, 2112, 48 L.Ed.2d 710 (1976) (statutes passed for the benefit of dependent Indian tribes are to be liberally construed, doubtful expressions being resolved in favor of the Indians).

The issue of standing was touched on only superficially by the parties although the court provided an opportunity to submit additional briefing on the issue. Based on its own independent review of the case law, the court finds that the precise issue raised here is undecided. The court also finds that it need not discuss this issue further because even if the plaintiff has standing, there are other reasons why the plaintiff cannot prevail.

■ The government also asserts that judicial review is not available because the Secretary's action was committed to agency discretion by law. Section 701(a)(2) of the Administrative Procedure Act, 5 U.S.C. § 701 provides that the action of "each authority of ... the United States" is subject to judicial review except where "agency action is committed to agency discretion by law." This provision precludes judicial review" in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971). Although § 81 simply states that no applicable contract is valid unless approved by the Secretary, the actions of the Secretary are "limited by the fiduciary responsibilities vested in the United States as trustee of Indian lands." *Kenai Oil & Gas Inc. v. Dep't of Interior*, 671 F.2d 383, 386 (10th Cir.1982). As a fiduciary, the Secretary is responsible for acting in the best interest of the Indians and his actions may therefore be reviewed. *Id.*

### Preliminary Injunction

■ The court has carefully reviewed all of the memoranda, proceedings, and the record herein, and concludes, as the parties have also, that there are no genuine issues of material fact that would preclude the court from finally resolving all issues raised in the complaint. The government stipulated shortly after the action was filed that it would forego taking any action on the basis of Assistant Secretary Fritz's decision until the Tribe's partial summary judgment motion is decided by the court. Accordingly, based upon that action and the ripeness of the issues for final resolution, the motion for preliminary injunctive relief has been mooted.

### Mandamus

■ Little Six seeks in the first instance, a writ of mandamus under 28

U.S.C. § 1361 directing the Secretary to approve the Bingo Hall Management Agreement. The remedy of mandamus is a drastic one, to be invoked only in extraordinary situations.[7] *Allied Chemical Corp. v. Daiflon, Inc.,* 449 U.S. 33, 34–35, 101 S.Ct. 188, 189–90, 66 L.Ed.2d 193 (1980); *In re GTE Service Corp.,* 762 F.2d 1024, 1026 (D.C.Cir.1985); *Sperry Rand Corp. v. Larson,* 554 F.2d 868, 872 (8th Cir.1977). The writ is not available when review by other means is possible. *Kerr v. United States District Court,* 426 U.S. 394, 403, 96 S.Ct. 2119, 2124, 48 L.Ed.2d 725 (1976); *Telecommunications Research and Action Center v. F.C.C.,* 750 F.2d 70, 78 (D.C.Cir.1984). Review is available in this court under the ordinary statutory review of agency action; therefore, mandamus may not be invoked.[8] *Telecommunications Research and Action Center,* 750 F.2d at 78. Plaintiff's arguments that the government is estopped and that the prohibition against *ex post facto* laws has been violated may be raised in the ordinary course of review. Full relief is available should the court accept those arguments.

Little Six asserts that the government's past conduct should estop it from taking any action other than approving the 1983 agreement. It also raises several grounds for remand of the Deputy Assistant Secretary's decision. The standard of review governing these challenges is found in § 706 of the Administrative Procedure Act, 5 U.S.C. § 706. It provides that agency action must be set aside if the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or failed to meet statutory, procedural, or constitutional requirements. 5 U.S.C. §§ 706(2)(A), (B), (C), (D); *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 413–14, 91 S.Ct. 814, 822–23, 28 L.Ed.2d 136 (1971).

Little Six asserts that the government's participation in the formulation of the 1982 bingo hall agreement and its pre-July 20, 1984 policy not to review bingo management agreements estops it from doing anything other than approving the 1983 agreement. The government asserts that it cannot be estopped by actions or statements of a government employee or agent and that, in any event, Little Six has failed to establish the necessary elements of estoppel.

 "It is well settled that the Government may not be estopped on the same terms as any other litigants." *Heckler v. Community Health Servs.,* 51 U.S. 467, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984). It remains an open question whether estoppel may in any circumstance run against the Government. *Id.; Leimbach v. Califano,* 596 F.2d 300, 305 (8th Cir.1979) (estoppel will not lie against the government for the misrepresentations of its agents). This court need not reach that issue, however, because a careful review of the record and case authority establishes that Little Six has not made out the necessary elements for estoppel against the Government. Little Six must at a minimum establish that the traditional elements of an estoppel are present. *Heckler v. Community Health Servs.,* 104 S.Ct. at 2224. Traditionally, for estoppel to lie:

> (1) The party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury.

*Morris v. Andrus,* 593 F.2d 851, 854 (9th Cir.1978), *cert. denied,* 444 U.S. 863, 100 S.Ct. 133, 62 L.Ed.2d 86 (1979); *see also Heckler v. Community Health Servs.,* 104 S.Ct. at 2223.

---

**7.** Issuance of the writ is also in large part a matter of discretion with the court to which the petition is addressed. *Kerr,* 426 U.S. at 403, 96 S.Ct. at 2124.

**8.** Of course, plaintiff's lack of standing to assert violations of § 81, would not provide a basis to proceed by mandamus. The plaintiff's claims for mandamus derive from its allegation that the government is estopped by its earlier interpretation of § 81 and that it therefore has a ministerial duty to approve the agreement. Thus, if plaintiff has no standing under § 81, there is no jurisdiction to hear this claim either.

Little Six fails to satisfy this test. The agency did not know at the time the bingo hall agreements were executed whether the language of § 81 would be interpreted to include such agreements. Thus, it, as well as the other parties, was unaware of facts essential to any claim of estoppel. No facts were concealed or known by the agency that were unknown to the plaintiffs. Furthermore, at no time did the agency represent that either bingo agreement was in the best interest of the Community or that it would be approved if presented to the Secretary for review.[9] *Cf. United States v. Huebner*, 752 F.2d 1235, 1244 (7th Cir.1985) (before estoppel will apply against the government, the alleged estopping statements must be in writing and must be made by officials at a policy-making level).

At the time of the negotiations New England was aware of § 81 and of the agency's practice not to review bingo agreements. It chose to proceed with the management agreement and to obtain the agency's tacit approval of any such agreement. To the extent the plaintiffs relied on the agency's current interpretation of the statute, it assumed the risk that that interpretation was in error. *Heckler v. Community Health Servs.*, 104 S.Ct. at 2226 n. 17; *Emery Mining Corp. v. Sec. of Labor*, 744 F.2d 1411 (10th Cir.1984). The agency had no power, simply by announcing its interpretation, to deprive the courts of their duty to construe the statute and to discern and implement Congress' intent. *Lerner v. Gill*, 751 F.2d 450 (1st Cir.), *cert. denied*, — U.S. —, 105 S.Ct. 2709, 86 L.Ed.2d 724 (1985); *McCauley v. Thygerson*, 732 F.2d 978 (D.C.Cir.1984).

The plaintiffs also have difficulty satisfying the requirement of detrimental reliance because they have collected over two million dollars in net profits from the bingo operations. If the contracts had been sub-

mitted when executed, it is very possible in light of the Secretary's decision that the agreements would have been rejected at their inception and no profits whatsoever would have accrued to the plaintiffs. *See Heckler v. Community Health Servs.*, 104 S.Ct. at 2225; *Tennessee ex rel. Leech v. Dole*, 749 F.2d 331, 337–38 (6th Cir.1984), *cert. denied*, — U.S. —, 105 S.Ct. 3480, 87 L.Ed.2d 615 (1985).

▮ Furthermore, the narrow constraints in which some courts might allow estoppel against the government do not exist here. *See, e.g., Heckler v. Community Health Servs.*, 104 S.Ct. at 2224 n. 12; *id.* at 2228 (Rehnquist, J., concurring). At a very minimum some affirmative misconduct by a government agent is required as a basis of estoppel. *See, e.g., United States v. River Coal Co.*, 748 F.2d 1103, 1108 (6th Cir.1984); *Emery Mining Corp. v. Sec. of Labor*, 744 F.2d at 1417 n. 7. The plaintiffs have failed to make any showing of such misconduct. Moreover, estoppel simply will not run against the government when it acts, as it did here, as trustee for an Indian tribe. *See, e.g., State of New Mexico v. Aamodt*, 537 F.2d 1102, 1110 (10th Cir.1976), *cert. denied*, 429 U.S. 1121, 97 S.Ct. 1157, 51 L.Ed.2d 572 (1977); *United States v. Ahtanum Irrigation Dist.*, 236 F.2d 321, 334 (9th Cir.1956), *cert. denied*, 352 U.S. 988, 77 S.Ct. 386, 1 L.Ed.2d 367 (1957).[10]

▮ Little Six also contends that the application of the instructions was retroactive and thus an abuse of discretion. Obviously, it was a change in department policy when the BIA began reviewing bingo management agreements in 1984. The court has already found that the agency's conformance to contemporaneous court decisions on the scope of § 81 is not a basis to estop it, however. In that same light, it was not an abuse of discretion for the

---

**9.** The review process under § 81 is initiated by submission of the proposed contract to the area director of the BIA and then is finally reviewed by the Deputy Assistant Secretary of the Interior-Indian Affairs. Although lower level department and BIA officials were present at the contract negotiations for the bingo hall, they had no

authority to review the contract. The agreements were first submitted to the BIA for review in October of 1984.

**10.** For these same reasons, Little Six's estoppel argument in the action brought by the Community also fails.

Secretary to apply the July 1984 instructions in rendering a decision on agreements submitted for his approval in October of 1984. The agency simply responded to court rulings that clarified unsettled and unchartered law. "Retroactive clarification of uncertain law ordinarily involves no unfairness. 'It is retroactive change of settled law, not retroactive settling of unsettled law, which may produce unjust results.'" *Anderson, Clayton & Co. v. United States*, 562 F.2d 972, 985 n. 30 (5th Cir.1977), *cert. denied*, 436 U.S. 944, 98 S.Ct. 2845, 56 L.Ed.2d 785 (1978) (quoting K. Davis, *Administrative Law Text*, § 5.05, 135 (3d ed. 1972)). Furthermore, if an interpretative regulation merely elucidates a meaning that has resided in the statute since its enactment, it is misleading to term it retroactive. *Id.* "It is no more retroactive . . . than is a judicial determination construing and applying a statute to a case in hand." *Manhattan General Equip. Co. v. Commissioner of Internal Revenue*, 297 U.S. 129, 135, 56 S.Ct. 397, 400, 80 L.Ed. 528 (1936). Here, the Secretary has clarified his general trust duty to act in the best interests of the Indian tribe, a duty in existence at the time § 2103, now § 81, was enacted in 1871.

This is the same standard that was applicable to § 81 in 1982 when the first management agreement was executed. It was not an abuse of discretion to apply that standard to bingo management agreements through use of the instructions, in response to federal court decisions construing § 81 to be applicable to such agreements.[11] *See Bradley v. Richmond School Bd.*, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974) (a court is to apply the law in effect at the time it renders its decision); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947) (every case of first impression has a retroactive effect, whether the new principle is announced by a court or by an administrative agency). Furthermore, the

application of the instructions furthers the intent of Congress that the Secretary ensure that contracts under § 81 are in the best interests of Indian tribes. *See S.E.C. v. Chenery Corp.*, 332 U.S. at 203, 67 S.Ct. at 1580.

For these same reasons, Little Six's contention that the application of the instructions to the 1983 management agreement violates the *ex post facto* clause is without merit. The Deputy Secretary's utilization of the instructions simply was not retroactive application of law "which imposes a punishment for an act which is not punishable at the time it was committed, or imposes additional punishment to that then prescribed." *Weaver v. Graham*, 450 U.S. 24, 28, 101 S.Ct. 960, 964, 67 L.Ed.2d 17 (1981) (quoting *Cummings v. Missouri*, 4 Wall. 277, 325–26, 18 L.Ed. 356 (1867)). Section 81 is a civil, not a penal, statute and was enacted long before the conduct challenged here. While an *ex post facto* challenge to the criminal statute, 18 U.S.C. § 438, which imposes criminal penalties for violations of § 81 might raise more substantive issues, the challenge to the civil provision does not. *See Harisiades v. Shaughnessy*, 342 U.S. 580, 594, 72 S.Ct. 512, 521, 96 L.Ed. 586 (1952).

Little Six asserts that the June 17 decision should be remanded because the Department applied the July 20, 1984 Instructions to the 1983 bingo hall agreement as substantive regulations but did not promulgate them in accordance with the notice and comment procedures of the Administrative Procedure Act, 5 U.S.C. § 553. The government argues that the instructions were issued in conformance with 5 U.S.C. § 553(b) because they are interpretive rules or general statements of policy for which no publication or hearing is required.

Section 5 U.S.C. § 553(b) establishes notice and comment requirements for sub-

---

**11.** The instructions were issued on July 20, 1984; the agreements between Little Six and the Community were not submitted for approval until October 1984. The Secretary indicated in his decision that the instructions were intended to govern approvals of contracts, not the execution of contracts. Thus, under this view, the instructions predated the submission of the contracts in October of 1984, and the issue of retroactivity is mooted.

stantive rulemaking, but specifically states that such requirements do not apply:

> (A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or
>
> (B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

 An interpretative rule simply explains and sets forth that which the administrative agency thinks the statute already requires. *General Motors Corp. v. Ruckelshaus*, 742 F.2d 1561, 1565 (D.C.Cir. 1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 2153, 85 L.Ed.2d 509 (1985). A general policy statement is agency action that does not establish a binding norm, but announces the agency's tentative intentions for the future. General policy statements must leave the agency free to exercise informed discretion. *Iowa Power & Light Co. v. Burlington Northern, Inc.*, 647 F.2d 796, 811 (8th Cir.1981), *cert. denied,* 455 U.S. 907, 102 S.Ct. 1253, 71 L.Ed.2d 445 (1982). In contrast, a rule should be considered to be a legislative rule if by its action the agency intends to create new law, rights, or duties. *General Motors Corp.*, 742 F.2d at 1565.

 Deputy Assistant Secretary Fritz labeled the memorandum as "instructions" and indicated that due to the BIA's uncertain authority to promulgate regulations of this nature, and the time it would take to do so, he did not intend to issue regulations at that time. The agency's own label is indicative, but not dispositive. *Chamber of Commerce v. Occupational Safety and Health Administration*, 636 F.2d 464, 468

(D.C.Cir.1980). Rather, the issue ultimately turns on the substance of what the agency has done. The court has carefully reviewed the agency's actions in the July 20, 1984 letter and finds that it is not a legislative rule as it did not have the intent or effect of creating new law, rights, or duties. Rather, the letter was the agency's construction of its statutory duty under § 81 to determine if submitted gambling agreements were in the best interests of the Indian tribes.[12] This is a requirement imposed by the statute itself, and the instructions are interpreting that statutory duty. *See Kenai Oil & Gas, Inc.*, 671 F.2d 383 (10th Cir.1982); *Leaf v. Udall*, 235 F.Supp. 366, 367–68 (N.D.Cal.1964). Under these circumstances, the July 20, 1984 memorandum is not a legislative rule. Accordingly, notice and comment procedures were not required.

 Little Six also attacks the merits of the Secretary's decision, arguing that the record reveals no rational basis for the decision and thus is arbitrary and capricious. The government contends that the decision is not only rational, but is the clearly correct decision based on the record. In deciding whether agency action was arbitrary and capricious, "the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. at 416, 91 S.Ct. at 823. "Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Id.*

The Secretary found in disapproving the 1983 bingo hall agreement that, consider-

---

**12.** The letter indicates that it was being issued in response to two recent federal court decisions holding that 25 U.S.C. § 81 renders tribal bingo management agreements invalid unless approved pursuant to that section. The letter indicates Fritz's view that those decisions are erroneous, but the letter is not addressed to that issue. Rather, its purpose is to indicate that in cases where tribes now request approval of their management contracts, the BIA should undertake to review them, and to provide instructions

that should be observed in reviewing those contracts. The letter also contains statements evidencing a tentative and nonbinding nature. It requests that recommendations for revisions be submitted and states that amended instructions will be issued as necessary. Amendments to the instructions were in fact issued on April 9, 1985. Instruction 21 also evidences that Area Directors possess discretion in making a decision to approve or reject the contract.

ing all the factors discussed in his order, the agreement was not in the best interests of the tribe. The Secretary noted that the failure of the agreement to comply with certain principles addressed in instructions 2, 4, and 18 of the July 20, 1984 memorandum "is a fairly clear indication that the contract is not in the Community's best interest." The Secretary also considered evidence of interference by Little Six in tribal governmental affairs. Finally, he noted that the community's opposition to the management agreement is "entitled to great weight ... in light of the well-established federal policy recognizing a government-to-government relation with the tribes and favoring tribal self-determination."

The court concludes that the agency has articulated, and there exists, a rational basis for the decision. For the reasons already stated, the Deputy-Secretary's use of the instructions was permissible. Little Six's vehement argument against application of the instructions is meritless because, with or without the written instructions, the Deputy-Secretary acting in his trust capacity for Indian lands, must seek the best interests of the Indian tribe. The Secretary brings to bear on the review process his experience and expertise, and the instructions are merely a formal recitation of the decisionmaking process that the agency employs with or without such instructions. The Secretary's finding that the contract should not be approved, because of its 15 year term with no provision for renegotiation of the 45% management fee, has a rational basis. This finding was based not on a technical violation of an instruction, but rather because, in the Secretary's judgment, there is "serious potential for unfairness to tribes in long-term inflexible management contracts." Contrary to Little Six's assertions, the Secretary did consider the economics and risks underlying this type of business venture, but concluded that "[a]lthough a high fee might be justified at the outset of a contract to offset risks taken by the management company, such justification would not normally be expected to continue throughout a contract period of several years duration", here, 15 years.[13]

The Secretary also gave great weight to the Community's opposition to the agreement, and that factor in and of itself may be a sufficient basis for the Secretary to conclude the contracts were not in the best interest of the tribe. *See Ho-Chunk Management Corp. v. Fritz*, 618 F.Supp. 616 (W.D.Wis., 1985) (Shabaz, J.). Coupled with the other noted grounds for disapproval, it is evident that a proper review and judgment was made by the Secretary and his disapproval of the contracts was not arbitrary or capricious.[14]

**13.** Little Six asserts that because of the involvement of a department attorney in the initial contract negotiations where these terms were agreed upon, it should be assumed that the contract would have been approved by the Secretary if it had been submitted for review in 1983. It is undisputed that the department attorney had no authority to approve or disapprove the contract, however; the power to review lay first with the Area Director and ultimately with the Deputy Assistant Secretary—Indian Affairs. The Secretary's application of the best interest standard provides reason to believe that the same conclusions would have been reached at an earlier review, however.

**14.** Additional grounds were put forth by the Secretary for not approving the contract. One basis was that the agreements were submitted by then chairman Norman Crooks rather than by tribal resolution as required by instruction 2. The Secretary also found that the contracts did not require the management company to abstain from interfering in tribal government as required by instruction 18, and in fact such interference had occurred. Little Six contends that these findings are erroneous and that instruction 18 may be violative of first amendment rights. Since the Secretary's decision is amply supported by the other asserted grounds, it is unnecessary to decide the constitutional arguments raised by Little Six.

The government takes the position that Little Six has challenged only the decision disapproving the 1983 management agreement. The complaint filed by Little Six seeks in part to have the June 17, 1985 decision of the Deputy Assistant Secretary declared null and void. Thus, the language of the complaint and requested relief encompasses both the decision to disapprove the 1983 and to disapprove the 1984 agreement. The Secretary's decision on the 1984 agreement, as well as the 1983 agreement, should be upheld on the present record.

**B. United States of America ex rel. Shakopee Mdewakanton Sioux Community v. Pan American Management Company, et al.**

■ Before the court are cross-motions for summary judgment and defendants' motion for a stay. A motion for summary judgment may be granted if the pleadings and affidavits show that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In passing upon a motion for summary judgment, the court is required to view the facts in the light most favorable to the party opposing the motion and to give that party the benefit of all reasonable inferences to be drawn from the underlying facts disclosed in pleadings and affidavits. *Buller v. Buechler*, 706 F.2d 844, 846 (8th Cir.1983); *Ralph's Distributing Co. v. AMF, Inc.*, 667 F.2d 670 (8th Cir.1981); *Vette Co. v. Aetna Casualty & Surety Co.*, 612 F.2d 1076 (8th Cir.1980). Disputes involving the interpretation and application of unambiguous contracts and statutory language, such as this motion, are appropriate cases for summary judgment. *Jackson v. Roosevelt Federal Savings & Loan Ass'n*, 702 F.2d 674, 684 (8th Cir.1983); *Parish v. Howard*, 459 F.2d 616, 618 (8th Cir.1972).

*Jurisdiction*

■ Defendants argue that the court lacks personal jurisdiction over the parties because no valid and effective service was made on any of the defendants. It asserts that plaintiff's motion must be denied, and the complaint dismissed under Fed.R.Civ.P. 4(j), because service was not made within 120 days after the filing of the complaint.

Service of process was made at the bingo hall by leaving copies of the summons and complaint for all defendants with Henry F. Ulrich, the Deputy General Manager for the Little Six Bingo Palace. Little Six Bingo Palace is owned by the Community and managed by Little Six Enterprises under the 15 year agreement at issue in this litigation. Ulrich works under the direction of the General Manager, Robert Page, and assists in supervising the overall operation. Affidavit of Henry F. Ulrich. Ulrich has day-to-day management responsibilities for the operation of the Little Six Bingo Palace. Under the management agreement between Little Six and the Community, Little Six has the responsibility to employ, direct, control, and discharge all personnel at the Bingo Palace. Furthermore, the agreement places the exclusive right to develop, manage, and operate the bingo property in Little Six Enterprises.

Service of process upon Ulrich was proper to establish personal jurisdiction over the partnership, Little Six Enterprises. Fed.R.Civ.P. 4(d)(3) provides that service shall be made upon a partnership.

> by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or to any other agent authorized by appointment or boy law to receive service of process and, if the agent is one authorized by statute to receive service and the statute so requires, by also mailing a copy to the defendant.

Service upon Ulrich qualifies as service upon "a managing or general agent" within the meaning of Fed.R.Civ.P. 4(d)(3). He had substantial authority and responsibility in the partnership's activities within the state, making it reasonable to assume that he would transmit notice of the commencement of the action to the partnership. *C. Wright & A. Miller, 4 Federal Practice & Procedure* § 1103 (1969); *2 Moore's Federal Practice* ¶ 4.22[2]. It is also persuasive that his employment and the entire bingo operation was under the absolute control and direction of Little Six Enterprises.[15] Notice is the keystone to proper service under Rule 4(d)(3), and there is no doubt that Little Six Enterprises was adequately

---

**15.** *See* 1983 Bingo Management Agreement. A managing or general agent need not be an employee of the defendant organization. *2 Moore's Federal Practice* ¶ 4.22[z]. No rigid rule can be laid down as to who is "a managing or general agent", and the court must closely analyze the facts and circumstances in the particular case. *Id.; C. Wright & A. Miller, 4 Federal Practice & Procedure* § 103 392 (1969).

informed of the commencement of this action. *Van Hoven Co., Inc. v. Stans*, 319 F.Supp. 180, 182 (D.Minn.1970).

 Service on a managing agent is only valid against the partnership, however. Jurisdiction over a partnership does not confer jurisdiction over a partner or other defendant unless the partner is properly served. *Olsen v. Puntervold*, 338 F.2d 21, 22 (5th Cir.1964); *Ford Motor Co. v. Sylte*, 188 Minn. 578, 579, 248 N.W. 55, 56 (1933); *Antiel v. V.W.E. Investments*, 353 N.W.2d 681, 683 (Minn.Ct.App.1984), *review denied*, Minn.S.Ct., January 9, 1985. The service upon Ulrich was the only service made. Accordingly, all defendants other than the partnership have not been properly served and should be dismissed under Fed.R.Civ.P. 4(j).[16]

 Little Six also argues that the court lacks subject matter jurisdiction over the 1983 Management Agreement because the plaintiff's complaint alleges only that the 1982 and 1984 agreements should be voided. The Community asserts the 1983 agreement is essentially identical to and is a successor of the 1982 agreement and that the injunctive relief requested to remove Little Six gives fair notice. All that is required under the Federal Rules of Civil Procedure is " 'a short and plain statement of the claim' that will give the defendants fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957). The complaint filed by the Community fully satisfies the "notice pleading" requirements by generally presenting the circumstances, occurrences and events in support of the claim being presented, and the relief sought. *C. Wright & A. Miller, 4 Federal Practice and Procedure* §§ 1201, 1205 (1969). Construed in light of the precept that "all pleadings shall be so construed as to do substantial justice," the complaint withstands this challenge by Little Six. Fed.R. Civ.P. 8(f).

### § 81

The Community's motion for summary judgment seeks to have the bingo hall and bingo lounge management contracts declared null and void under 25 U.S.C. § 81. Section § 81 provides in relevant part

No agreement shall be made by any person with any tribe of Indians, or individual Indians not citizens of the United States, for the payment or delivery of any money or other thing of value, in present or in prospective, or for the granting or procuring any privilege to him, or any other person in consideration of services for said Indians relative to their lands, or to any claims growing out of, or in reference to, annuities, installments, or other moneys, claims, demands, or thing, under laws or treaties with the United States, or official acts of any officers thereof, or in any way connected with or due from the United States, unless such contract or agreement be executed and approved as follows:

\* \* \* \* \* \*

Second. It shall bear the approval of the Secretary of the Interior and the Commissioner of Indian Affairs indorsed upon it.

\* \* \* \* \* \*

All contracts or agreements made in violation of this section shall be null and void.

The bingo management agreements for the hall and the lounge have both been disapproved by the Deputy Assistant Secretary of Interior-Indian Affairs, thus if § 81 is applicable to the agreements they are void.

Little Six argues that § 81 only applies to contracts between tribes and attorneys or claims-agents relating to lobbying the government. It argues that this interpretation is supported by the case law, legislative history, and administrative interpretation. It reads statutory language so that the portion of § 81 covering "services for

---

**16.** The court finds that the assertions of claims against these defendants were not in bad faith nor frivolous. Accordingly, Little Six's request

for attorneys' fees and costs and Rule 11 sanctions is denied.

said Indians relative to their lands is limited by the subsequent language "under the laws and treaties of the United States." The Community argues on the other hand that the plain language of the statute, legislative history, and subsequent interpretations by the courts and the agency support application § 81 to all contracts "relative to" Indian lands.

"The starting point in every case involving construction of a statute is the language itself." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 197, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668 (1976). Section 81 is drafted broadly to encompass any agreement made by "any person" involving payment in consideration "of services for ... Indians relative to their lands or to any claims growing out of, or in reference to, annuities, installments, or other monies, claims demands, or thing, under laws or treaties with the United States, or official acts of any officers thereof, or in any way connected with or due from the United States". The plain meaning of the statute is that its provisions apply either to agreements relative to their lands, "or" alternatively, to claims by the tribes growing out of the listed events and arising "under laws or treaties with the United States." *See* F. Cohen, *Handbook of Federal Indian Law* 281.

Little Six asserts that this last phrase should be construed to be a limitation upon the first type of agreements, those relative to Indian lands, as well as upon claims growing out of annuities and other demands. The statute does not support such a narrow construction, however. The broad language "relative to their lands" evidences the intent of Congress to cover almost all land transactions in Indian property. *See Central Machinery Co. v. Arizona State Tax Comm'n*, 448 U.S. 160, 166, 100 S.Ct. 2592, 2596, 65 L.Ed.2d 684 (1980) ("Until Congress repeals or amends

the Indian ... statutes ... we must give them 'a sweep as broad as their language' and interpret them in light of the Congress that enacted them." (Indian trader statutes)); *Wisconsin Winnebago Business Committee v. Koberstein & Ho-Chunk Management*, 762 F.2d 613, 618 (7th Cir. 1985). The language "relative to their lands" is clear and complete and stands apart from the alternative language which follows the word "or". Interpreting it to stand independent of the subsequent clauses is consistent with the broad introductory language. In contrast, the subsequent language of "any claims ... or other monies, claims, demands, or thing," is not self-contained or specifically defined and is clearly modified by the provision "under laws or treaties." Interpreting § 81 to apply to all contracts relative to Indian land is also consistent with the longstanding policy of regulating all transactions in Indian land, which predates this country's formation as an independent nation. *Id.;* F. Cohen, *Handbook of Indian Law* 508–09 (1982).

This interpretation of § 81 is supported both by recent case law and by earlier decisions. In *Wisconsin Winnebago Business Committee*, the Seventh Circuit in reviewing the applicability of § 81 to an almost identical bingo management agreement held that it was obvious from the language of the statute that it was intended to cover almost all land transactions in Indian property.[17] *Wisconsin Winnebago Business Committee*, at 618; *see also Flandreau Indian Management Co. v. Flandreau Santee Sioux Tribe*, Civ. 84–4055 (D.S.D. April 11, 1984) (Jones, J.). In *Green v. Menominee Tribe*, 233 U.S. 558, 34 S.Ct. 706, 58 L.Ed. 1093 (1914), the Supreme Court held that an oral contract between an Indian tribe and a trader for supplies to be used in logging Indian land

---

**17.** In *Sac and Fox Tribe v. Apex Constr. Co., Inc.*, 757 F.2d 221 (10th Cir.1985), the court held it need not decide if § 81 governed the construction contract at issue because it found the statute not applicable to Economic Development Administration grant monies. The district court had held that § 81 was not applicable because

the statute's purpose is "to protect Indian people from dissipating their lands through agreements for imaginary services costing exhorbitant amounts." *Id.* at 222. To the extent the district court's reasoning in *Sac and Fox Tribe* might differ with that in *Winnebago* and in this action, it is rejected.

was so clearly within the text of the statute that it suffices to direct attention to such text without going further. But if it be conceded for argument's sake that there is ambiguity involved in determining from the text whether the statute is applicable, we are of the opinion that the case as made is so within the spirit of the statute and so exemplifies the wrong which it was intended to prevent and the evils which it was intended to remedy as to dispel any doubt otherwise engendered.

*Id.* at 569, 34 S.Ct. at 710. Little Six puts forth alternative interpretations of the *Green* decision, but the court finds the language to be straightforward. *Green* supports the proposition that the plain meaning of § 81 compels its application to contracts relative to Indian lands.

▮ Where the language of a statute is sufficiently clear in its context, it controls without resort to the more tangential aid of legislative history. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 201, 96 S.Ct. 1375, 1384, 47 L.Ed.2d 668 (1976). The language of § 81 placed within the context of federal oversight of Indian land is controlling and conclusive. The court has nevertheless reviewed the parties' extensive analysis of the legislative history and administrative interpretations. Unquestionably, these materials can give rise to conflicting interpretations. Careful consideration of the parties' arguments and the legislative history against the backdrop of the statutory language and federal policy of regulating Indian land transactions leads the court to conclude that § 81 was intended to be applicable to contracts for services relative to Indian lands.

There is no dispute that the main impetus behind the enactment of § 81 was the fraud and abuse being inflicted upon Indian tribes by attorneys and claim agents allegedly representing their interests before the federal government. *See, e.g.,* Cong.Globe, 41st Cong.3d Sess. 1483–87. The overriding evil which Congress sought to ad-

dress and protect the Indians from was "improvident and unconscionable contracts.". *In re Sanborn,* 148 U.S. 222, 227, 13 S.Ct. 577, 579, 37 L.Ed. 429 (1893). The contractual relations with attorneys and claims agents were foremost on Congress' mind because they provided many sordid examples of the exploitation of Indians by nonIndians. Yet, Congress also considered and debated whether the provision totally prohibited Indians from making contracts and noted in several places the expansive and alternative nature of the language adopted. *See* Cong.Globe, 41st Cong., 3d Sess. 1486 (Section 81 "would prevent such contracts ... in any matter relating to the land or annuities that they hold under or derive from the United States") (Section 81 "is limited to such agreements or services as are made or rendered relative to the lands of the Indians or to any claim against annuities from or treaties with the United States".)

▮ The debates indicate that Congress intended the broad language incorporated in § 81 and that the language should be given its full meaning. The application of § 81 to contracts relative to Indian lands is drawn from the literal language of the statute and, furthermore, is fully consistent with Congress' concern for the protection of Indians from nonIndians.[18] *Wisconsin Winnebago Business Committee,* at 617–619; *cf. Sedima S.P.R.L. v. Imrex Co.,* —— U.S. ——, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) (the fact that RICO has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth); *Fortnightly Corp. v. United Artists Television, Inc.,* 392 U.S. 390, 395 n. 16, 88 S.Ct. 2084, 2087 n. 16, 20 L.Ed.2d 1176 (1968) ("While statutes should not be stretched to apply to new situations not fairly within their scope, they should not be so narrowly construed as to permit their evasion because of changing habits due to new inventions and discoveries.")

---

18. The parties each argue and dissect the varied interpretations given § 81 by the Department of the Interior. The administrative treatment is for the most part not contemporaneous with the passage of § 81 and is inconclusive at best.

The court next must turn to whether the bingo management agreements are "agreement[s] ... relative to [Indian] land." A careful review of the management agreements shows them to be inextricably tied up in the property rights flowing from the establishment of the bingo operations on tribal trust lands. The very existence of the bingo operations arises from the Indian tribe's sovereignty over tribal trust lands which makes state gaming laws inapplicable to games on reservations. *See Wisconsin Winnebago Business Committee*, at 616 n. 3. This is the very reason why bingo can be profitably offered by the Community. But for its land, state law would not permit it.[19] The agreements give the management company the absolute right to control the construction, development, maintenance, and operation of the property. The legal description of the tribal property encompassed by the agreement is specifically included in an appendix to the agreement. The agreement also extends to any other bingo facilities established on tribal trust lands during the lifetime of the contract. Little Six is given the right to record the agreements "in any Public Records" and the Community is prohibited from directly or indirectly causing "any party to become an encumbrancer of the property subject to this Agreement without the prior written consent of [Little Six]."

In *Wisconsin Winnebago Business Committee* virtually identical contractual language was held to be "relative to Indian land" under § 81. This court finds the reasoning of that case persuasive and holds that the agreements numerous ties with the land makes them "relative to [Indian] lands." If there is any doubt in the applicability of § 81 it is resolved by several canons of statutory construction rooted in the "unique trust relationship between the United States and the Indians." *Oneida County v. Oneida Indians*, —— U.S. ——,

105 S.Ct. 1245, 1258, 84 L.Ed.2d 169 (1985). Thus, statutes "passed for the benefit of dependent Indian tribes ... are to be liberally construed, doubtful expressions being resolved in favor of the Indians." *Bryan v. Itasca County*, 426 U.S. 373, 392, 96 S.Ct. 2102, 2112, 48 L.Ed.2d 710 (1976) (quoting *Alaska Pacific Fisheries v. United States*, 248 U.S. 78, 89, 39 S.Ct. 40, 42, 63 L.Ed. 138 (1918); *see also McClanahan v. Arizona Tax Commission*, 411 U.S. 164, 174, 93 S.Ct. 1257, 1263, 36 L.Ed.2d 129 (1973). Furthermore, ambiguous provisions are to be interpreted to the Indian tribe's benefit. *Montana v. Blackfeet Tribe of Indians*, —— U.S. ——, 105 S.Ct. 2399, 2403–04, 85 L.Ed.2d 753 (1985).

Little Six raises the defense of estoppel and asserts that application of § 81 to the agreements would be violative of the *ex post facto* clause and unconstitutionally vague. For the reasons stated previously the Community is not estopped to assert § 81, and the statute's application is not an *ex post facto* violation. *See also Green v. Menominee Tribe*, 233 U.S. 558, 570–71, 34 S.Ct. 706, 710–11, 58 L.Ed. 1093 (1914) (no estoppel). Section 81 is also not unconstitutionally vague under the due process clause of the Fifth Amendment. Its literal language conveyed sufficiently definite warnings for parties contracting with Indian tribes when measured by common understanding or practice. *Horn v. Burns & Roe*, 536 F.2d 251, 254 (8th Cir.1976). Its language is not so "vague and indefinite as really to be no rule or standard at all." *Id.* (quoting *A.B. Small Co. v. American Sugar Refining Co.*, 267 U.S. 233, 239, 45 S.Ct. 295, 297, 69 L.Ed. 589 (1925)).

The court has carefully considered the statutory provisions and the undisputed language of the agreements at issue and finds that even when evaluating the facts in the light most favorable to Little Six, the

---

19. It is obviously not the case that every contract with Indian tribes would require § 81 approval. Little Six's argument that application of § 81 here would lead to this result is simply incorrect. The bingo management agreements contain numerous provisions, as stated above, that specifically implicate Indian lands in the performance of the contracts and relate Little Six services to the land. Furthermore, the very existence of this type of operation is wholly dependent on the Indian land.

plaintiff is entitled to judgment as a matter of law declaring the management agreements null and void under 25 U.S.C. § 81.

In sum, the court finds that in *Little Six Enterprises v. Hodel,* Civ. 4–85–888, the defendants are entitled to summary judgment on all counts and the action should be dismissed with prejudice. In *United States of America ex rel. Shakopee Mdewakanton Sioux Community,* Civ. 4–85–231 the court finds that all defendants other than Little Six should be dismissed. The court also finds that the Community is entitled to partial summary judgment because as a matter of law the bingo management agreements are null and void under § 81.[20]

## ORDER

Accordingly, based on the above and all the files, records, and proceedings herein,

IT IS HEREBY ORDERED that

1. The motion in Civ. No. 4–85–880 of defendants Donald P. Hodel and John W. Fritz for summary judgment is granted, and the action is dismissed with prejudice in its entirety as to all defendants.

2. The motions in Civ. No. 4–85–880 of plaintiff Little Six Enterprises for preliminary injunctive relief and summary judgment are denied.

3. The motion in Civ. No. 4–85–231 of defendants Pan American Management Company, New England Entertainment Company, John Panetta, and Alfred Estrada is granted to the extent that the complaint is dismissed against them without prejudice under Fed.R.Civ.P. 4(j). In all other respects defendants' motion for partial summary judgment and sanctions is denied.

4. The motion in Civ. No. 4–85–231 of plaintiff *United States of America ex rel. Shakopee Mdewakanton Sioux Community* for partial summary judgment is granted, and the management agreements be-

tween Little Six Enterprises and the Shakopee Mdewakanton Sioux Community for the bingo hall and bingo lounge are hereby declared null and void.

5. The motion of defendants in Civ. No. 4–85–231 for a stay pending final disposition of Civ. No. 4–85–880 is denied as moot.

LET JUDGMENT BE ENTERED ACCORDINGLY.

---

**20.** Because the court finds the management agreements void under § 81 it need not reach whether the agreements are void under the other statutory provisions put forth by the Community. The Community also notes in its memoranda that it has filed motions to dismiss the counterclaims and consolidated complaint filed by Little Six. Those motions were held in abeyance during the administrative appeals; if the Community wishes to renew them, it should schedule them on the court's hearing calendar.