### In re U.S.A. ex rel. Glenn A. HALL, et al. Litigation.

Civ. Nos. 3–92–792, 3–92–793, 3–92–795, 3–92–796, 3–92–798, 3–92–799, 3–92–801 to 3–92–804, 3–92–839, 4–92–1159, 4–92–1175, 4–92–1176 to 4–92–1186, 4–92–1188 to 4–92–1194, 4–92–1196 to 4–92–1204 and 4–92–1261.

United States District Court,
D. Minnesota,
Third Division.

June 11, 1993.

**1424**

Thomas Albers, Lance Riley, Mark Vieno, Minneapolis, MN, for plaintiffs.

Robert Brunig, Craig Diviney, Dorsey & Whitney, Minneapolis, MN, John Van De North, Briggs & Morgan, St. Paul, MN, Justin Perl, Douglas Radunz, John Bonner, III, Michael Berens, Minneapolis, MN, John Furlow, Madison, WI, for defendants.

## MEMORANDUM AND ORDER

MAGNUSON, District Judge.

### BACKGROUND

Following the 1988 passage of the federal Indian Gaming Regulatory Act (IGRA), 25 U.S.C. §§ 2701–21 (1988), Indian tribes in Minnesota, Wisconsin and throughout the nation began to operate casinos and other Class II and Class III "gaming" establishments and operations authorized by the Act. *See* 25 U.S.C. § 2710 (defining various classes of gaming under IGRA). In the course of establishing and operating the tribal gaming enterprises, Indian tribes in Minnesota and Wisconsin transacted business and entered contracts with various outside merchants and vendors for provision of goods and services. Transactions included contracts for sale and rental of gaming machines and equipment, advertising and marketing, training and management services and other goods and services necessary for the operation of tribal gaming facilities.

A number of these tribal gaming operations have prospered, providing much-needed revenue for the tribes and their members. The tribes, apparently satisfied with the contracts and arrangements for provision of goods and services related to their gaming operations, have not sought to revise or challenge those transactions. However, several persons not party to the agreements now seek to challenge them, contending those

agreements violate federal law. The "relator-plaintiffs," private citizens suing on behalf of the United States, filed 42 suits in this court against the vendors who provided goods and services to the tribes seeking to void various contracts and transactions entered by Indian tribes in Minnesota and Wisconsin. The relator-plaintiffs (hereinafter plaintiffs) contend that the contracts are void for failure to comply with federal government approval requirements and other statutory provisions of 25 U.S.C. § 81 (1988); the Indian Trader Licensing Act (ITLA), 25 U.S.C. §§ 201 & 261–64 (1988); and the IGRA, 25 U.S.C. §§ 2701–21 (1988).

The plaintiffs seek, *inter alia,* rescission of the contracts and transactions at issue in these suits and refund of all monies paid by Indian tribes to defendant merchants pursuant to such contracts. If plaintiffs were successful, one-half of the refunded monies would be returned to the Indian tribes while the other half would be paid directly to the plaintiffs, as a reward for their assistance in the enforcement of federal laws. *See* 25 U.S.C. § 81. Plaintiffs also seek payment of penalties and other compensation pursuant to applicable federal statutes. *See, e.g.,* 25 U.S.C. § 201. The plaintiffs allege they are members of the Lac Courte Oreilles Band of Indians, which is party to contracts involved in four of these lawsuits. They allege no direct connection with the contracting parties in any of the other suits.

These cases were consolidated for pre-trial consideration before this court. Plaintiffs now seek summary judgment in each of these cases. Several defendants also move for summary judgment, while others have filed motions to dismiss.

## DISCUSSION

*Motion to Dismiss Standard*

■■ For the purposes of the defendants' motions to dismiss, the court takes all facts alleged in the plaintiffs' complaints as true. *Westcott v. City of Omaha,* 901 F.2d 1486, 1488 (8th Cir.1990). Further, the court must construe the allegations in the complaints and reasonable inferences arising from the complaints favorably to the plaintiffs. *Morton v. Becker,* 793 F.2d 185, 187 (8th Cir. 1986). A motion to dismiss will be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief." *Id.* at 187; *see Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). The court applies those standards and analysis in the following discussion.

## I. STANDING

■ In order to maintain an action in federal court, all plaintiffs must show they meet the standing requirements of Article III of the United States Constitution. This is a threshold question in every federal case, which determines whether a federal court has the power to hear the suit. *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). In order to establish standing, a plaintiff must make a three part showing: (1) plaintiff must have sustained an injury in fact, i.e. an invasion of a legally protected interest which is concrete and particularized and actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection between that injury and the complained-of conduct; and (3) it must be likely—as opposed to merely speculative—that the injury can be redressed by a favorable decision. *Lujan v. Defenders of Wildlife,* —— U.S. ——, ——, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (citations omitted).

### A. 25 U.S.C. § 81

■ The parties agree that Congress enacted 25 U.S.C. § 81 for the protection of American Indians and Indian tribes. *See United States ex rel. Shakopee Mdewakanton Sioux Community v. Pan American Mgmt. Co.,* 616 F.Supp. 1200, 1208 (D.Minn. 1985) (statute was enacted "solely for the protection and benefit of Indians"), *appeal dismissed,* 789 F.2d 632 (8th Cir.1986). Plaintiffs have not alleged they are members of the class of people the law was intended to protect. Even more significantly, plaintiffs have alleged no actual or concrete injury to themselves or their interests. Therefore, they fail to satisfy the indispensable actual injury requirement for standing to bring suit in federal court. *See id.* at 1207–08.

The text of 25 U.S.C. § 81 does not contradict this conclusion. The statute provides, in pertinent part:

> All contracts or agreements made in violation of this section shall be null and void, and all money or other thing of value paid to any person by any Indian or tribe, or any one else, for or on his or their behalf, on account of such services, in excess of the amount approved by the Commissioner and Secretary for such services, may be recovered by suit in the name of the United States in any court of the United States, regardless of the amount in controversy; and one-half thereof shall be paid to the person suing for the same, and the other half shall be paid into the Treasury for the use of the Indian or tribe by or for whom it was so paid.

25 U.S.C. § 81. The statute does not expressly establish standing for third persons who claim no direct interest in the contract, agreement, goods or services at issue. The statute merely states that suit may be brought in the name of the United States and that the person who prevails in such a suit is entitled to half of the recovery. The statute is silent as to which individuals or entities other than the United States may bring suit to enforce its provisions.[1] Absent compelling evidence of clear congressional intent, this court will not infer or "read into" a statute a provision which effectively waives the Article III "injury in fact" requirement—an indispensable condition of this court's power to hear disputes.[2] *See Lujan,* — U.S. at —, 112 S.Ct. at 2136 (injury in fact is element of three-part "irreducible constitutional minimum" for standing); *see also Middlesex Cty. Sewerage Auth. v. National Sea Clammers,* 453 U.S. 1, 14–15, 101 S.Ct. 2615, 2623–24, 69 L.Ed.2d 435 (1981) (absent clear evidence of congressional intent, courts should not ordinarily read additional remedies into statute which already provides remedies).[3]

1. If Congress had intended to confer standing to sue on any and all persons without regard to any other injury or standing requirement, it could have done so readily by inserting such language as "any person [or "any citizen"] may bring suit to enforce this section." Several "private attorneys general" and "citizen suit" provisions in federal statutes show that Congress knows how to confer standing on all citizens when it chooses to do so. *See, e.g.,* Federal Water Pollution Control Act, 33 U.S.C. § 1369(b). Congress did not explicitly create such broad standing here and this court refuses to do so by judicial legislation.

2. Finding the present plaintiffs have no standing to sue under 25 U.S.C. § 81 is consistent with previous decisions of this court cited by plaintiffs because the parties and their interests distinguish those cases from the case at bar. *United States ex rel. Shakopee Mdewakanton Sioux Community v. Pan American Mgmt. Co.,* 616 F.Supp. 1200 (D.Minn.1985) primarily considered two consolidated cases. In the first case, a management company which was party to a casino management contract brought suit against the Secretary of the Interior challenging his disapproval of the contract. Despite the fact that the plaintiff was a party to the contract in question, the court expressed doubt about whether the plaintiff had standing to bring the suit. Because the plaintiff lost on other grounds, the court declined to decide the standing issue in the first of the two consolidated cases. *See id.* at 1207. In the second *Shakopee Mdewakanton Sioux* case, the other party to the management contracts, the Indian community, sued to have multiple management contracts declared void. In addition to having an interest in the validity of the contracts, the Indian community had an even stronger claim to standing because the statute under which it sued was enacted for the benefit of Indians, thus placing them squarely within the "zone of interest" of the statute. *See id.* at 1208.

In *United States ex rel. Dale Childs v. Glenn Hall & Assocs.,* CV 3–91–663, 1992 WL 521520 (D.Minn.1992), the relator-plaintiff sought to void a management contract between a management company and the Prairie Island Mdewakanton Sioux Community. Relator-plaintiff Childs was a *member* of the Prairie Island Community, whose interests were directly implicated by the Community's contract. The Community's failure to obtain the Secretary of Interior's approval of the management contract constituted an actual, concrete injury to the plaintiff, satisfying that prong of the standing test.

Plainly, the United States itself also has standing to sue to vindicate the rights of Indians under federal statutes. *See, e.g., Moe v. Confederated Salish & Kootenai Tribes,* 425 U.S. 463, 478 & n. 13, 96 S.Ct. 1634, 1643 & n. 13, 48 L.Ed.2d 96 (1976).

3. Plaintiffs allege they are members of the Lac Courte Oreilles Band of Lake Superior Chippewa Indians (LCO Band), whose contracts are the subject of four of these suits (File numbers 4–92–1179, 4–92–1192, 4–92–1204 and 4–92–1261). The plaintiffs allege no specific injury-in-fact in those cases. Because the court finds, *infra,* that those cases must be dismissed for failure to join an indispensable party, it need not decide whether membership in the LCO Band alone would be sufficient to confer standing on plaintiffs to challenge contracts and transactions entered by that Band.

In a similar case, the Eighth Circuit recently reached the same conclusion. A non-Indian plaintiff brought suit pursuant to the same statute, seeking to contest a management contract between an Indian tribe and a management company. *Schmit v. International Finance Mgmt. Co.*, 980 F.2d 498 (8th Cir.1992). Because the plaintiff alleged no injury and was not within the zone of interests protected by 25 U.S.C. § 81, the court held he had no standing to bring the action. *Id.*

### B. 25 U.S.C. §§ 201, 261–64

■ The preceding standing analysis applies with equal force to the plaintiffs' claims under the Indian Trader Licensing Act (ITLA), 25 U.S.C. §§ 201 & 261–64. Initially, nothing in sections 261–64 discusses who may bring suit to enforce those provisions. Unlike 25 U.S.C. § 81, there is no language in sections 261–64 which could even arguably provide a basis for non-Indian private citizen or *qui tam* standing. Therefore, the plaintiffs' standing to bring an action pursuant to the ITLA could rest only on 25 U.S.C. § 201.

Congress enacted the "penalties" provision (currently codified at 25 U.S.C. § 201), through which plaintiffs seek standing to enforce the ITLA against the defendants, at the same time as the ITLA, in 1834. The statute provides:

> All penalties which shall accrue under this title shall be sued for and recovered in an action in the nature of an action of debt, in the name of the United States, before any court having jurisdiction of the same, in any State or Territory in which the defendant shall be arrested or found, the one half to the use of the informer and the other half to the use of the United States, except when the prosecution shall be first instituted on behalf of the United States, in which case the whole shall be to their use.

25 U.S.C. § 201.

Similar to section 81, this statute is silent regarding which persons other than the United States may bring suit. It simply states that an "informer" is entitled to one-half of the penalty resulting from a successful suit. For the reasons set forth above with respect to section 81, the court will not infer standing for any and all persons, regardless of injury. Because plaintiffs do not allege direct, "actual injury" to their own interests, they fail to satisfy the standing requirements of Article III of the Constitution. *See Lujan,* —— U.S. at ——, 112 S.Ct. at 2136.

### C. Limited Recovery

■ Even if plaintiffs could establish standing to sue under 25 U.S.C. § 201, their potential recovery under that statute would be limited to half of any penalty imposed by the ITLA. Under the Act, a person who trades with an Indian without proper permission "shall forfeit all merchandise offered for sale ..., *and shall moreover be liable to a penalty of $500.*" 25 U.S.C. § 264 (emphasis added). The application of the section under which plaintiffs seek recovery is confined to "*penalties* which shall accrue under this title." 25 U.S.C. § 201 (emphasis added). The plain language of the statute does not provide for any other recovery. Therefore, the court concludes that even a proper private plaintiff suing to enforce sections 264 through 201 would be entitled to recover only one-half of the applicable penalty, i.e., $250. *See U.S. ex rel. Hornell v. One 1976 Chev.*, 585 F.2d 978, 981 (10th Cir.1978) (reviewing language of statute and legislative history and concluding § 264 forfeiture is not "penalty" and thus cannot be recovered by private litigant under 25 U.S.C. § 201).

### D. Indian Gaming Regulatory Act

■ Plaintiffs also seek to recover civil penalties for alleged violations of the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. §§ 2701–21.[4] They cite no provision of the IGRA which might confer standing on private litigants to seek monetary relief. In its review of the detailed and comprehensive statute, the court finds no provision which

---

4. Many of the complaints in these cases do not allege any IGRA violation or cause of action. Obviously, in the cases in which plaintiffs have not pleaded an IGRA claim, they cannot pursue such a claim without amending their complaint. This discussion thus applies only to those cases in which plaintiffs have properly pleaded (in a procedural sense) an IGRA claim.

would supply an arguable basis for non-member private litigant standing.[5]

The plaintiffs argue that 25 U.S.C. § 201 provides standing for them to bring an action to enforce the civil penalty provisions of the IGRA. However, the ITLA and the IGRA are two completely separate statutes, with different structures, purposes, and histories. Neither the language nor the history of section 201 suggests it applies to the IGRA. The language of the statute refers to "penalties which shall accrue under this title." The "title" to which the 1834 statute refers is Title XVIII of the Revised Statutes, which was comprised of the former Revised Statutes §§ 2039 to 2157. Many of those statutes were subsequently repealed, all were recodified, and none includes any provision of the IGRA. Congress enacted the IGRA in 1988, 155 years after the enactment of section 201. To suggest that in 1834 Congress foresaw the IGRA and the development of Indian gaming in its modern form would strain credulity. The IGRA is a broad, comprehensive statute. If Congress had intended to grant the extraordinary sort of standing plaintiffs seek to assert through a distant section and chapter of the United States Code, it likely would have explicitly discussed such standing or made reference to section 201 within the comprehensive structure of the IGRA. Plaintiffs proffer no evidence, not even the slightest piece of legislative history, suggesting that Congress ever intended that section 201 would provide private citizen standing to bring suit to enforce the penalty provisions of the IGRA. Plaintiffs' bare reliance on the language of an antiquated statute enacted to address different concerns is grossly inadequate to support this extraordinary and tenuous standing argument.

Because the plaintiffs have no standing to bring these actions, the court has no subject matter jurisdiction. It is well-established that federal courts are courts of limited jurisdiction. The Constitution prohibits this court from hearing suits outside its subject matter jurisdiction, regardless of the parties' positions with respect to the question or the procedural posture of the suits. Therefore, the court must dismiss all of these suits. Those cases which the parties have not moved to dismiss for lack of subject matter jurisdiction, the court dismisses *sua sponte.*

## II. INDISPENSABLE PARTIES

The court also finds that these cases must be dismissed for inability to join an indispensable party. Even if the plaintiffs could establish standing to bring these actions, the court would dismiss them because the Indian tribes who are parties to the agreements and transactions at issue are necessary and indispensable parties who cannot be joined involuntarily. *See* Fed.R.Civ.P. 19.

■ One who is not a party to an action is "necessary" to the action under Rule 19(a)(2)(i) if that person "claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may ... as a practical matter impair or impede the person's ability to protect that interest." Because the absent Indian tribes are parties to the challenged contracts, their interest in the validity of the contracts would be directly affected by the judgment the plaintiffs seek. Therefore, the Indian tribes are necessary parties under Rule 19(a)(2)(i). *See Enterprise Mgmt. Consultants, Inc. v. United States ex rel. Hodel,* 883 F.2d 890, 893 (10th Cir.1989).

■ However, the absent tribes cannot be involuntarily joined because they enjoy sovereign immunity from suit. *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 58, 98 S.Ct.

---

5. This court's recent decision finding that members of an Indian tribe had standing to bring an action for the narrow purpose of enforcing the approval requirements of the IGRA is inapposite. *See* Memorandum and Order, *Maxam, et al. v. Lower Sioux Indian Community of Minn.,* CV 3–92–193, —— F.Supp. —— (D.Minn. March 11, 1993). The plaintiffs in that action were members of an Indian community who were seeking to force the community to comply with IGRA approval provisions enacted for the benefit of Indians. With the exceptions previously noted, the plaintiffs in the present actions are not members of the Indian tribes which executed the allegedly improper agreements and transactions, nor can they claim any direct interest in those transactions. Further, even in *Maxam,* the court did not hold that plaintiffs had standing to seek monetary relief or penalties such as the plaintiffs seek in these cases.

1670, 1677, 56 L.Ed.2d 106 (1978).[6] If a person who is necessary under Rule 19(a)(2) cannot be made a party, "the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable." Fed.R.Civ.P. 19(b).

█ The Rule sets out four factors a court should consider in deciding whether an absent person is indispensable. The first two of the four factors are particularly relevant here:

> to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; [and] the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided.

Fed.R.Civ.P. 19(b). As discussed above, the absent tribes are parties to the challenged contracts and transactions. The goods and services provided pursuant to the agreements are essential to the operation of the commercial casinos owned by the tribes. A judgment avoiding those transactions certainly would be prejudicial to the interests of the casinos and their owners, the tribes.

In a larger sense, the precedent set by rescission of transactions freely entered by the tribes would likely be extremely prejudicial to the tribes' long term interest in Indian gaming and the revenue it provides. The plaintiffs essentially seek rescission of the contracts and disgorgement of money paid for goods and services rendered pursuant to those contracts. The message such a judgment would send to outside vendors would be that transactions with Indian gaming enterprises are subject to cancellation at any time and without regard to whether the contracts were freely and fairly negotiated, the extent to which the parties have performed their duties under the contracts or the settled expectations and reliance of the parties. Very few merchants would be willing to transact business with Indian casinos under such risky conditions. This might well signal the end of Indian gaming in the Upper Midwest. Regardless of whether such a judgment would otherwise constitute the correct application of the law, it would undeniably be prejudicial to the interests of the Indian tribes.

The court can discern no way it could craft relief to reduce the prejudice to the nonparty Indian tribes. The plaintiffs seek rescission of contracts and transactions. There is no middle ground—either the transactions violate statutory requirements and are void, requiring repayment of all value paid by the tribes, or they comply with the law and are valid. See 25 U.S.C. §§ 81, 264. The tribes are intimately involved in these transactions and it would be impossible to fashion protective provisions to insulate them from the prejudice an adverse judgment would inflict. Even if the court were to take the extraordinary step of creating an intermediate remedy not provided in the statutes, any partial rescission or monetary relief granted to the plaintiffs would substantially prejudice the interests of the tribes by disrupting their existing commercial relationships and jeopardizing future commercial transactions and relationships. Therefore, the second factor of the Rule 19(b) test also weighs in favor of dismissal.

█ A judgment for the plaintiffs rendered in the absence of the tribes would also encroach on tribal sovereignty. It is well-established that, subject to limited exceptions, tribes have the right to self-governance, unimpeded by federal authorities. See Martinez, 436 U.S. 49, 98 S.Ct. 1670; Morton v. Mancari, 417 U.S. 535, 551, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974) (noting strong congressional policy of promoting Indian self-government). Plaintiffs seek, inter alia, to force the defendants to return monies already paid to them by various Indian tribes in return for goods and services. In a similar though not identical case, the

6. Despite the fact that many of the Indian tribes that are parties to the challenged transactions are aware of the pendency of these suits seeking to void the contracts—ostensibly to protect the Indians' interests—not one of those tribes has sought to join this action as a plaintiff. At the very least, this suggests that the tribes themselves have a different view of the merit and wisdom of the contracts and transactions at issue in this matter.

Eighth Circuit recently held that "any order purporting to affect money already disbursed would be an impermissible encroachment on tribal sovereignty." *Pembina Treaty Comm. v. Lujan,* 980 F.2d 543, 545 (8th Cir.1992). In that case, the Eighth Circuit upheld the dismissal of a suit on the ground that an affected Indian tribe was an indispensable party. *Id.* Recognizing the overriding importance of tribal sovereignty, the Court held the dismissal proper even though the trial court found the plaintiffs had no other recourse to press their claim. *Id.*

Potential prejudice to the interests of the non-party tribes and protection of tribal sovereignty are such strong considerations in the present case that they must outweigh the remaining factors enumerated in Rule 19(b). With respect to the fourth factor, it appears that the plaintiffs may have no other remedy if these cases are dismissed. However, as demonstrated in the preceding standing discussion, the interests of plaintiffs in this matter are tenuous and indirect. In contrast, the non-party Indian tribes' interest in the transactions which are the subject of these suits is direct, clear and strong. As the Ninth Circuit has stated, "No procedural principle is more deeply imbedded in the common law than that, in an action to set aside a lease or a contract, all parties who may be affected by the determination of the action are indispensable." *Lomayaktewa v. Hathaway,* 520 F.2d 1324, 1325 (9th Cir. 1975), *cert. denied,* 425 U.S. 903, 96 S.Ct. 1492, 47 L.Ed.2d 752 (1976). Moreover, where a necessary party is immune from suit, there may be "very little room for balancing of other factors" because immunity may be considered a compelling interest. *Wichita & Affiliated Tribes of Oklahoma v. Hodel,* 788 F.2d 765, 777 n. 13 (D.C.Cir.1986); *see also Enterprise Mgmt.,* 883 F.2d at 894 (dismissing an action under section 81 because a tribe was an indispensable party).

Therefore, these suits must be dismissed for failure to join indispensable parties.

## III. CHANGE OF VENUE

The plaintiffs have moved to change the venue of several cases to the Federal District Court for the Western District of Wisconsin.[7] Initially, because the plaintiff chooses where to bring an action, concerns about the fairness and convenience of venue generally focus on the defendant, not the plaintiff. *See Leroy v. Great Western United Corp.,* 443 U.S. 173, 180–84, 99 S.Ct. 2710, 2714–17, 61 L.Ed.2d 464 (1979). More significantly, in all but one of these cases, the court need not address the question of change of venue because it does not have subject matter jurisdiction. Because plaintiffs have no standing to bring those actions, the court does not have power to hear them and thus the question of proper venue does not arise.

In the remaining action, the plaintiffs have a colorable standing argument due to their alleged membership in the Lac Courte Oreilles Band. *See U.S.A. ex. rel. Glenn Hall v. Interstate Gaming Serv., Inc.,* Civil No. 4–92–1192 (D.Minn. Dec. 2, 1992). However, the court has previously determined that action should be dismissed for inability to join an indispensable party. *See* Fed.R.Civ.P. 19. Therefore, the change of venue motion in this case is denied as moot.

## IV. LEASES AND CONTRACTS FOR GOODS

The court found above that these suits must be dismissed for lack of standing and failure to join indispensable parties. Although each of those grounds is independently sufficient to dismiss these cases, the court believes it appropriate to discuss a third alternative ground for judgment in favor of the defendants in several cases brought under 25 U.S.C. § 81. In those cases,[8] plain-

---

7. The civil case file numbers of those eight cases are 3–92–801, 3–92–804, 4–92–1159, 4–92–1180, 4–92–1192, 4–92–1194, 4–92–1196 and 4–92–1202. These eight defendants initially moved to dismiss this matter for lack of personal jurisdiction. Without explanation, the defendants withdrew their personal jurisdiction objections on the day of the hearing.

8. Those cases, which constitute the majority of the cases considered today, can be classified according to their three defendants. Defendant Sodak Gaming Supplies, Inc. is the defendant in Minnesota federal District Court civil file numbers 3–92–792, 3–92–793, 3–92–796, 3–92–798, 3–92–803, 4–92–1179, 4–92–1181, 4–92–1182, 4–92–1183, 4–92–1184, 4–92–1185, 4–92–1186, 4–92–1188, 4–92–1191, 4–92–1193, 4–92–1197, 4–

tiffs seek to void leases and contracts for the sale of goods and services for non-compliance with statutory requirements.

■ Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Unigroup v. O'Rourke Storage & Transfer Co.*, 980 F.2d 1217, 1219–20. (8th Cir.1992). Unless the provisions of the contracts at issue are ambiguous, raising questions of fact, questions of the applicability of 25 U.S.C. § 81 to contracts between Indians and non-Indian contractors are questions of law, appropriate for resolution at summary judgment. *See Barona Group of the Capitan Grande Band of Mission Indians v. American Mgmt. & Amusement, Inc.*, 840 F.2d 1394, 1400–1401 (9th Cir.1987); *Wisconsin Winnebago Business Committee v. Koberstein*, 762 F.2d 613, 619 (7th Cir.1985). No party suggests that the provisions of the contracts are ambiguous or that there exist any other genuine issues of material fact. Therefore, these cases are ripe for resolution on the parties' summary judgment motions.

Section 81 applies to two types of agreements; contracts for "services" to Indians "relative to their lands," and contracts for services relative to claims for payments due under federal law or "in any way connected with or due from" the United States. 25 U.S.C. § 81 (1988). Agreements governed by section 81 are subject to five requirements, one of which is that the agreements be approved by the Secretary of the Interior and the Commissioner of Indian Affairs. An agreement that does not meet all five of these requirements "shall be null and void" and any money paid by Indians or Indian tribes "in excess of the amount approved" may be recovered in a suit brought under section 81. Half of the recovery in a section 81 action goes to the plaintiff.

Some of the contracts the plaintiffs challenge in these cases are for the sale or lease of gambling equipment or for other services

short of managing a casino. In some cases these other services consist of delivering, installing, and maintaining equipment and training personnel to use it. In other cases, the defendants contracted to advertise and market casinos. None of the challenged contracts are for services related to claims, the second class of contracts which section 81 governs. Therefore, if section 81 applies to any contract at issue in these actions, it is because the contract is "relative to [Indian] lands." The defendants contend that section 81 does not govern the non-management contracts because they are neither service contracts nor "relative to [Indian] lands." The plaintiffs respond that the contracts satisfy both requirements.

### A. Scope of Section 81

■ The language of section 81 establishes unambiguously that it applies to service contracts but not to sales contracts. The provision never mentions goods or merchandise but repeatedly refers to "services." Moreover, it describes the contracts it applies to as agreements for "services ... relative to [Indian] lands," and for "services ... relative to ... any claims" for money due under federal law or from the United States. This delineation of section 81's scope suggests that Congress was concerned about contracts for the representation of Indians' interests, not ordinary sales contracts. *See U.S. ex. rel. Shakopee Mdewakanton Sioux Community v. Pan American Mgmt. Co.*, 616 F.Supp. 1200, 1217 (D.Minn.1985) (legislative history of section 81 shows that "contractual relations with attorneys and claims agents were foremost on Congress' mind"), *appeal dismissed*, 789 F.2d 632 (8th Cir. 1986). Other evidence bolsters the conclusion that section 81 does not govern sales contracts. For example, at the time Congress enacted section 81, the ITLA had been in existence for over thirty years. The ITLA requires non-Indians who trade with Indians to obtain a federal license. That this mechanism for regulating sales between Indians and non-Indians was in place when Congress

92–1199, 4–92–1200 and 4–92–1203. Creative Games Technology, Inc. is defendant in civil files 4–92–1175, 4–92–1176, 4–92–1177 and 4–92–

1178. Hanson Distributing is defendant in cases 3–92–795, 3–92–799, 3–92–802, 4–92–1189, 4–92–1190, 4–92–1198 and 4–92–1201.

enacted section 81 suggests that the later statute was not directed at sales contracts.

The legislative history of section 81 also supports the interpretation that it does not apply to contracts for the sale of goods. It appears from the legislative history that Congress was concerned specifically about contracts for services such as representation of Indian interests before Congress and the pressing of Indians' claims. For example, in urging passage of the measure, a proponent stated that non-Indians had contracted with Indians to represent them before Congress for exorbitant fees, including large portions of congressional appropriations to Indians. *See* Cong. Globe, 41st Cong., 3d Sess. 1484, 1486 (Feb. 22, 1871) (comments of Mr. Wilson). Another proponent stated that "The object of this section is to protect the Indians and the Government both against ... claim agents." *Id.* at 1484 (comments of Mr. Corbett). Yet another supporter argued that, in addition to being unfair, representation agreements were unnecessary because the Indian Commissioner, federal Indian agents, and the Indian Committees in Congress adequately represented the Indians' interests. *Id.* at 1487 (comments of Mr. Casserly).

Despite the clear wording of section 81, the prior enactment of the ITLA, and the legislative history, the plaintiffs contend that *Green v. Menominee Tribe*, 233 U.S. 558, 34 S.Ct. 706, 58 L.Ed. 1093 (1914), precludes any distinction between sales and service contracts in applying section 81. The *Green* Court concluded that an agreement to supply Indians with logging equipment and supplies was "clearly within the text of" section 81,

without explaining how the sale of goods constituted a service. *Id.* at 569, 34 S.Ct. at 710. As the transaction in *Green* seems to have been a sale, *id.*, it appears that the Supreme Court once interpreted section 81 to apply to sales contracts. However, as the Seventh Circuit has stated, this "quite ancient" decision does not adequately explain why the statute should apply to such contracts. *Wisconsin Winnebago Business Committee v. Koberstein*, 762 F.2d 613, 617 (7th Cir.1985) [9]. Moreover, citing *Koberstein*, the Seventh Circuit recently held that an agreement to manufacture products on tribal trust lands was not governed by section 81. *Altheimer & Gray v. Sioux Manufacturing Corp.*, 983 F.2d 803, 812 (7th Cir. 1993). This Court is persuaded by the *Altheimer* court's reasons for disregarding the plaintiffs' proffered reading of *Green.* Therefore, the Court concludes that Congress did not intend that section 81 govern sales contracts.[10]

## B. "Relative to [Indian] Lands"

Because section 81 states that it applies to agreements for "services ... relative to [Indian] lands," any contract within the scope of section 81 must be both a service contract and relative to Indian lands. The non-management contract defendants argue that their contracts are not "relative to [Indian] lands." No Eighth Circuit decision has defined this phrase. In *Altheimer*, however, the Seventh Circuit considered Seventh, Eighth, and Ninth Circuit bingo management contract decisions that held such contracts

---

9. In addition, the parties, posture, and policy considerations in *Green* distinguish it from the case at bar. In *Green*, the plaintiff was a vendor who provided logging equipment and supplies and did not receive payment. The defendant was the Menominee Indian Tribe, which had made payment to an "Indian agent," who failed to forward the payment to the plaintiff. The concerns of the enacting Congress about parties taking unfair advantage of Indian tribes in representation before Congress and in some commercial transactions were clearly implicated in *Green* and the Indian tribe used the secretarial approval requirement as a shield against effectively being forced to pay twice for the same goods. In the present case, plaintiffs, who were not parties to the transactions, seek to use section 81 as a sword to skewer the defendant vendors. Fur-

ther, as discussed earlier, if the plaintiffs were successful in wielding their section 81 sword, they would also wound non-party Indian tribes and their members, whom section 81 was designed to protect.

10. Although it appears from the legislative history that the lease and other non-management service contracts in these cases also may not be the sort of contracts Congress intended section 81 to govern, the court need not address that issue. As the following discussion shows, regardless of whether those types of services and transactions might otherwise be within the statute, the contracts at issue in these cases are not "relative to [Indian] lands" and thus fall outside the ambit of section 81.

were relative to Indian lands under section 81. *Id.* at 810–11 (discussing *Barona Group of Capitan Grande Band of Mission Indians v. American Mgmt. & Amusement, Inc.,* 840 F.2d 1394 (9th Cir.1987), *cert. dismissed,* 487 U.S. 1247, 109 S.Ct. 7, 101 L.Ed.2d 958 (1988); *A.K. Mgmt. Co. v. San Manuel Band of Mission Indians,* 789 F.2d 785 (9th Cir. 1986); *Wisconsin Winnebago Business Comm. v. Koberstein,* 762 F.2d 613 (7th Cir. 1985); *United States ex rel. Shakopee Mdewakanton Sioux Community v. Pan American Mgmt. Co.,* 616 F.Supp. 1200 (D.Minn. 1985), *appeal dismissed,* 789 F.2d 632 (8th Cir.1986)). The *Altheimer* court distilled from these cases four factors "important" to determining whether a management contract is relative to Indian lands. *Id.* This Court finds the *Altheimer* court's analysis persuasive and believes that consideration of these four factors is appropriate in management contract cases. The factors, none of which is a *sine qua non* to a finding of relation to Indian land, are: 1) whether the contract relates to the management of a facility on Indian lands; 2) if so, whether the non-Indian party has exclusive rights to operate that facility; 3) whether the Indians are forbidden from encumbering the property; and 4) whether the operation of the facility depends on the Indian tribe's status as a separate sovereign. *Id.*

The *Altheimer* factors may not pertain directly to the defendants' sales, lease, and non-management services contracts because these contracts are not management contracts. Nevertheless, application of the sound principles behind the *Altheimer* factors reveals that the defendants' non-management contracts are not "relative to [Indian] lands."

First, these contracts do not relate to the management of a facility on Indian lands. A mere sale or lease of equipment clearly is not management. Nor are delivering, installing, and servicing equipment. Training casino personnel to use equipment is somewhat more akin to a management activity, but it certainly does not constitute management of a facility. Finally, while marketing and advertising might be considered management

activities, neither can be described as management of a *facility* on Indian land.

The *Altheimer* court's analysis under the first factor supports the conclusion that the defendants' contracts in the cases at bar do not relate to the management of a facility on tribal land. There, the court found that a contract for technical and engineering assistance, marketing, training management personnel, and consulting services regarding the operation of a manufacturing plant on tribal lands did not implicate this factor because "the facility was already in existence, was part of the Tribe's ongoing business, and was wholly owned by the Tribe." *Altheimer,* 983 F.2d at 806, 811.

Second, the defendants' contracts give them no exclusive rights to or control over Indian lands. Although in some cases the defendants' lease contracts give them the right to replace less profitable gambling machines in order to increase profits, this is not a grant of exclusive rights or control over Indian lands because the tribes and their management companies retained much greater control over the casino facilities. Similarly, in the cases in which the defendants provide marketing and advertising, their contracts do not give them control over any facilities. *See Altheimer,* 983 F.2d at 811 (finding that the second factor did not apply because the Indian management corporation "would be heavily involved in the venture," even though it did not have unilateral power to set wages, salaries, or operational and administrative costs, and even though "it may be an understatement to characterize [the non-Indian corporation] as a consultant").

Third, the plaintiffs do not allege, nor does any evidence in the record suggest, that the contracts forbid the Indian tribes from encumbering any property.

The fourth factor is the only one that appears to lend the plaintiffs any support. The operation of gambling facilities, and therefore, in a sense, the provision of gambling supplies and related services, does indeed depend on the Indian tribes' status as separate sovereigns; absent this status state law would forbid the operation of the casinos. *See Altheimer,* 983 F.2d at 812 ("Unlike bin-

go, manufacturers of latex medical products need not seek refuge from state civil laws by locating on a reservation."). This factor, however, is not germane to the non-management contracts in these cases; if it were, all hiring of non-Indian casino employees and even the provision of toilet paper to a casino on Indian lands, for example, would require section 81 approval. Such a requirement would place an enormous administrative burden on Indian tribes, non-Indian contractors, and the government agencies responsible for section 81 approval. As the legislative history of section 81 indicates, the 1871 Congress was not interested in requiring that such mundane transactions be federally approved. The court concludes that the defendants' sales, lease, and non-management services contracts are not relative to Indian lands and thus need not comply with the requirements of section 81. Therefore, even if plaintiffs could establish standing to bring this action and show that the Indian tribes were not indispensable parties, the defendants would be entitled to summary judgment in these actions brought under section 81.

## CONCLUSION

Plaintiffs have failed to establish standing to bring these suits. Further, because the Indian tribes are indispensable parties that cannot be joined in these suits, these cases must be dismissed under Fed.R.Civ.P. 19. Finally, the defendants are entitled to summary judgment in the majority of these cases because 25 U.S.C. § 81 does not apply to the contracts at issue in those actions.

Several of the defendants move for sanctions against the plaintiffs and their counsel, pursuant to Fed.R.Civ.P. 11. After careful review, the court determines sanctions are not appropriate in this matter.

Accordingly, **IT IS HEREBY ORDERED THAT:**

All of these cases are DISMISSED for lack of standing and inability to join an indispensable party;

Defendants' motions for summary judgment in civil case file numbers 3–92–792, 3–92–793, 3–92–796, 3–92–798, 3–92–803, 4–92–1179, 4–92–1181, 4–92–1182, 4–92–1183, 4–92–1184, 4–92–1185, 4–92–1186, 4–92–1188, 4–92–1191, 4–92–1193, 4–92–1197, 4–92–1199, 4–92–1200, 4–92–1203, 4–92–1175, 4–92–1176, 4–92–1177, 4–92–1178, 3–92–795, 3–92–799, 3–92–802, 4–92–1189, 4–92–1190, 4–92–1198 and 4–92–1201 are GRANTED; and

Defendants' motions for sanctions are DENIED.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**